Receipt number AUSFCC-9248332

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| ADVANCED SIMULATION TECHNOLOGY INC.,<br><br>                        Plaintiff,<br><br>     v.<br><br>UNITED STATES OF AMERICA,<br><br>                     Defendant. | 23-2201 C<br><br>Case No. _____ |

**<u>COMPLAINT</u>**

Hamish P.M. Hume
Samuel C. Kaplan
Gina A. Rossman
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-2727 (t)
(202) 237-6131 (f)
hhume@bsfllp.com
skaplan@bsfllp.com
grossman@bsfllp.com

*Counsel for Plaintiff Advanced Simulation Technology inc.*

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................. 1

PARTIES .............................................................................................................. 8

JURISDICTION ................................................................................................... 8

BACKGROUND ................................................................................................ 10

I.     Government Agencies Must Prioritize The Procurement Of Commercial And Nondevelopmental Products, And They Must Avoid Unlawful Discrimination On The Basis Of Race Or Tribal Status. ................................................... 10

    A.    Federal Law Requires Agencies To Prioritize The Procurement Of Commercial And Nondevelopmental Products. ............................ 10

    B.    The Fifth Amendment Equal Protection Guarantee Prohibits Discrimination On The Basis Of Race Or Tribal Status In A Way That Is Untethered From Issues Of Tribal Sovereignty Or Remedying The Effects Of Past Discrimination, Including In Connection With SBA 8(a) Preferences For Native American Tribes And ANC Subsidiaries. ................. 14

II.    ASTi Offers Commercial, Nondevelopmental Products That Meet And Exceed The DRMS-NG Requirements, And TSD Failed To Consider Those Products Before Issuing An Award To Bowhead. ................................................... 21

    A.    ASTi Offers Commercial, Nondevelopmental Training and Simulation Products. ...................................................................... 21

    B.    ASTi Products Meet And Exceed The DRMS-NG Requirements. ............... 22

    C.    TSD Failed To Consider ASTi Products Before Issuing An Award To Bowhead. .................................................................. 23

III.    TSD's DRMS-NG Solicitation And Award To Bowhead Violated Its Legal Obligations. ............................................................................................. 26

    A.    TSD Violated 10 U.S.C. § 3453 And Related Laws By Failing To Conduct Required Market Research, And By Failing To Procure Commercial And Nondevelopmental Items To Meet The DRMS-NG Requirements. ............................................................................. 26

    B.    TSD Violated the Fifth Amendment Equal Protection Guarantee By Awarding Bowhead A Contract On the Basis Of Its Race Or Tribal Status. .................................................................................. 27

CLAIMS FOR RELIEF ..................................................................................... 28

i

COUNT ONE: TSD Violated 10 U.S.C. § 3453 And Related Regulations By Failing To Conduct Sufficient Market Research To Determine Whether Commercial Products Existed That Might Satisfy The DRMS-NG Requirements.......................................................................................... 28

COUNT TWO: TSD Violated 10 U.S.C. § 3453 And Related Regulations By Refusing To Procure Commercial Or Nondevelopmental Items To The Maximum Extent Practicable........................ 29

COUNT THREE: TSD Awarded the Contract Without Competition Pursuant To Unconstitutional Preferences That Discriminate On The Basis Of Race In A Manner That Is Untethered From Issues Of Tribal Sovereignty Or Remedying The Effects Of Past Discrimination. ................................ 31

PRAYER FOR RELIEF ........................................................................................................... 33

Advanced Simulation Technology inc., for its Complaint against the United States of America acting through the Naval Air Warfare Center Training Systems Division, alleges as follows.

## INTRODUCTION

1.    Advanced Simulation Technology inc. ("ASTi") brings this bid protest to enjoin a Department of Defense ("DoD") award that was made in flagrant defiance of laws that favor commercial products, and in contravention of the Fifth Amendment equal protection guarantee. 10 U.S.C. § 3453 and associated regulations (the "commercial product preference requirement") require DoD and its divisions to favor commercial and nondevelopmental products in procuring products "to the maximum extent practicable." Further, the same law requires DoD to conduct market research as to the availability of commercial and nondevelopmental items to meet its requirements at each of the various stages of procurements and to use that market research to make required determinations as to the availability of commercial technology to meet its requirements. The Government in this case has violated the commercial product preference requirement in its procurement of critical naval air training technology.

2.    The DoD supervises each branch of the United States Military, including the Department of the Navy (the "Navy"). The Naval Air Systems Command ("NAVAIR") is an organizational unit (or "command") within the Navy that serves as the principal provider of materiel support for naval aviation. The term "materiel" refers to military supplies, equipment, and weapons. "Materiel support" in the modern military includes technologies that enable servicemembers to test and train with military weapons, vehicles, and equipment in real or simulated environments.

3.    The Naval Air Warfare Center Aircraft Division is housed within NAVAIR. It

oversees the Naval Air Warfare Center Training Systems Division ("TSD"). TSD spends $8 billion or so each year to procure and develop training and simulation systems that satisfy requirements and specifications for NAVAIR, for the United States Marine Corp, for the Department of the Air Force (the "Air Force"), and for other military units that choose to work with TSD.

4.    NAVAIR tends to favor "Live, Virtual, & Constructive" ("LVC") training and simulation systems, which offer a more realistic experience and require increased human participation compared to conventional training and simulation systems. Earlier this year at an industry conference, Vice Admiral Scott Conn, who serves as the deputy chief of naval operations for warfighting requirements and capabilities, remarked that LVC training and simulation systems allow servicemembers "to see scenarios you couldn't show them before, to be able to see things in training before they see it in combat." He underscored the importance of LVC training and simulation systems (and thus the products at issue in this bid protest) with the comment: "when you see something for the first time, you pause, and when you pause in combat, people die."

5.    Many modern military training and simulation systems—including those that are classified as LVC systems—combine simulated and actual (*i.e.*, live radio frequency ("RF")) radio communications to make the user experience as realistic as possible. These features, and other important features, are only available through sophisticated hardware and software products.

6.    TSD accessed these features for many years through the "Digital Radio Management System" ("DRMS"). Notwithstanding the availability of commercial products, TSD designed and developed DRMS with a combination of in-house technical staff and outside contractors. Most of the Navy is now familiar with DRMS as a result of Military Interdepartmental Purchase Requests ("MIPRs"), which allow one naval department to access products and technologies used by another department. The way in which DRMS has proliferated through TSD

influence and MIPRs poses serious organizational conflict of interest concerns. DRMS directly competes with various ASTi "commercial off-the-shelf" ("COTS") products, which are nondevelopmental, ready-made products that require minimal alteration. The ASTi "Voisus" line of products is most directly comparable to DRMS.

7.     DRMS exemplifies a chronic TSD tendency to favor internally developed products, which are plagued by the sort of issues one would expect from products that fail to account for commercial technologies: exorbitant costs, prolonged adoption timelines, inefficiencies, and lack of lifecycle support. These issues are compounded by bugs, obsolescence, and interoperability with other systems.

8.     DRMS' performance deficiencies are well-known, and the system has failed to keep pace with the capabilities of COTS alternatives (including the ASTi Voisus products). ASTi customers benefit from greater product availability and reliability, expedited acquisition times, lower life cycle costs, and increased competition and innovation.[1]

9.     TSD unfortunately has failed to learn from its prior misadventures with developing new products in general and DRMS in particular. Rather than harness the power of the commercial market and existing commercial technologies, TSD is poised to double down on its failed development effort by commencing a new development effort. ASTi became aware last summer of TSD's plans for a "Digital Radio Management System – Next Generation" ("DRMS-NG"), when TSD announced its plans for an Indefinite Delivery/Indefinite Quantity procurement seeking to acquire the capability to develop, design, produce, modify, test, deliver and support DRMS.

---

[1] ASTi does not challenge the original decision to develop DRMS in this litigation. The way that it was developed, however, helps to explain why DRMS is so outdated and insufficient and helps to explain the illegality and senselessness of the decision that *is* challenged in this case to double down on a previously failed development effort with more development when there are readily available commercial alternatives that can meet TSD requirements.

10.    Since sharing its plans to develop or procure a DRMS-NG system, TSD has kept quiet concerning requirements, specifications, and timelines. ASTi combs the public records regularly but could not find any evidence of a solicitation, even though one was expected during the summer of 2023.

11.    ASTi was surprised to learn through a single line in an update provided in connection with the November 14, 2023, industry day Procurement Action Lead Time ("PALT") meeting that TSD has already issued an award for the DRMS-NG procurement. An Excel spreadsheet provided by TSD in connection with the PALT meeting states that the "Acq Strategy" was "8(a)," that the "Actual RFP" was dated "17 JUL 2023," and that the "Actual Award" of $12.3 million was made "28 SEP 2023" to "Bowhead." The "8(a)" program is run by the Small Business Administration ("SBA") and is intended, in part, to help companies owned and controlled by socially and economically disadvantaged individuals. The RFP was kept secret, and there was no public indication of the award until the November PALT spreadsheet was released. No further detail accompanied the single line description in the spreadsheet.

12.    ASTi contacted TSD on December 8, 2023, seeking (1) any RFP or solicitation that was issued for DRMS-NG (whether public or otherwise); (2) documentation of the DRMS-NG award to Bowhead; (3) the relevant contract or contractual documents governing the DRMS-NG award to Bowhead; and (4) the detailed performance specifications that the development was intended to specify. ASTi requested a response from TSD by December 19, 2023.

13.    The contracting officer for DRMS-NG responded with a letter to ASTi on December 19, 2023. The officer clarified that the DRMS-NG award was made to Bowhead Professional and Technical Solutions, LLC ("Bowhead"), an 8(a)-program participant, as a "follow-on to a previously awarded 8(a) effort."

14.     Bowhead is a subsidiary of UIC Government Services, LLC ("UICGS"), which in turn serves as the holding company for several dozen specialized entities within the Ukpeaġvik Iñupiat Corporation ("UIC"), an Alaska Native Corporation ("ANC"). UICGS advertises on its website that it is a "Top 5" ANC, that it has "been in business for over 20 years," as well as that it has 3000 employees and 300 prime and subcontracts. Its parent company, UIC, advertises that it "is one of Alaska's largest companies with 4,000 employees, fifty-four subsidiaries, $3 billion in backlog, and an additional $25 billion in the pipeline."

15.     TSD chose Bowhead so that it could develop the DRMS-NG system internally, in complete secrecy, and without defending its decision to shun available commercial products. The Bowhead website advertises that 8(a) sole-source contracting allows for a "significantly accelerated procurement timeline, without the disruptions and delays resulting from complex evaluations and resulting protests." Bowhead suggests that "[t]he Government may award sole source contracts to ANC 8(a) companies up to $100M without Justification and Approval (J&A) and more then $100M with J&A, offering an unlimited threshold[.]" And Bowhead contends through its website that "only tribally-owned corporations such as ANCs can offer sole source procurements protected from protests."

16.     While the award and solicitation have not been made public, all indications are that it will be a ground-up development effort. There is no indication that Bowhead offers COTS products like the ASTi Voisus line. The Bowhead website states that Bowhead "provides a unique range of Engineering, Management, Analytical, and Technical services to the federal, state, and local governments, and private industry." "Key capabilities" of Bowhead purportedly include "system of systems engineering," "software engineering," "computer engineering," "cyber security engineering," "logistics engineering," "system architecture engineering," "system

5

interoperability engineering," and "system test engineering."

17.     This procurement is unlawful. No significant engineering is required for TSD to procure technology that satisfies the requirements and specifications for the DRMS-NG system. TSD has ignored commercial offerings from companies like ASTi in violation of section 3453's requirements. TSD knows that there is no rationale for ignoring existing commercial and nondevelopmental technologies that satisfy its requirements and specifications for the DRMS-NG system, and so it chose to work with Bowhead under the assumption that its decision would never need to be defended, since 8(a) sole-source awards to Indian tribes and to ANC subsidiaries require less notice and justification than other awards. TSD touted these facts in its December 19 letter and purported to inform ASTi that it is exempt from certain synopsizing requirements through 48 C.F.R. § 5.202(a)(4), which exempts a procurement from those requirements if "[t]he proposed contract action is expressly authorized or required by a statute to be made through another Government agency, including acquisitions from the [SBA] using the authority of section 8(a) of the Small Business Act[.]"

18.     This explanation, however, ignored sections 3453 and its requirements which do not contain an exception for small businesses. Put another way, section 8(a) does not permit the Navy to engage in software development efforts where commercial and nondevelopmental products are available that can meet the TSD's requirements regardless of whether the development contract is awarded to small business.

19.     In addition to violating the law, TSD's latest efforts violate its own professed commitment to looking first to commercial items. DoD published a guidebook in January 2018 for acquiring commercial items in which it explained that "[a]ccess to commercial items and practices brings significant benefit to DoD including: creation and integration of new technology; greater

6

product availability and reliability; reduced acquisition cycle times; lower life cycle costs; increased competition, and an expanded pool [of] innovative and non-traditional contractors that seek to do business with DoD." The DoD guidebook noted that commercial procurement serves as a "vital tool to achieve our national objectives." TSD has weakened industry competition by discarding a decisive DoD preference for commercial products and seeking instead to develop technology on its own or with hired labor.

20.     The attempt to develop DRMS-NG in secret is still more insidious given a parallel practice that has developed within the Navy to bypass section 3453 more broadly by using MIPRS, which are similarly exempt from normal notice and justification requirements, to deploy various technologies that have been developed internally (including but not limited to DRMS) to block the use of commercial technologies by the military on a more widescale basis. Once such technology is developed, it is practically inevitable through MIPRs that most of the Navy will come to rely on technology that was developed by government staff, by contractors who were chosen in a vacuum insulated from competitive pressure, and without research into the capabilities of commercial products. Other agencies throughout the United States Military and government will feel empowered to ignore commercial offerings themselves if TSD and the Navy are able to get away with ignoring ASTi commercial products. The Air Force, through its "Live Mission Operations Network" program, is itself already seeking to replace commercial training and simulations products with internally developed products like DRMS. The capabilities of internally developed products are often demonstrably inferior to those of COTS products, and so this phenomenon threatens to gravely weaken the military-industrial base.

21.     The award that TSD issued to Bowhead must accordingly be set aside as violative of section 3453. Further, if it were not unlawful, it would have to be set aside as unconstitutional

because TSD issued an award to Bowhead without competition based on its status as an ANC subsidiary, and in doing so, violated the Fifth Amendment equal protection guarantee.

## PARTIES

22.     Plaintiff ASTi is a corporation incorporated under the laws of the State of Delaware. Its principal place of business is located at 500A Huntmar Park Drive, Herndon, Virginia 20170. Since 1989, ASTi has been at the vanguard of innovation for live and simulated training solutions for the military. ASTi has fielded over 11,500 systems at more than 1,000 installation sites in 50 countries.

23.     The Defendant is the United States, acting through TSD and the SBA 8(a) business development program.

## JURISDICTION

24.     This Court has jurisdiction over this challenge to the DRMS-NG award pursuant to 28 U.S.C. § 1491(b)(1), which provides broad jurisdiction over any "object[ion] to . . . the award of a contract . . . in connection with a procurement or a proposed procurement." ASTi is an interested party and prospective offeror with a direct economic interest in the DRMS-NG award.

25.     ASTi is an interested party because it offers state-of-the-art hardware and software as commercial and nondevelopmental products that (1) meet and even exceed the requirements of the DRMS-NG system, (2) have been deployed by other divisions within the Navy and the United States Armed Forces, and (3) are substantially likely to be acquired by TSD if it is required to comply with its obligations under § 3453 and the other provisions of law invoked in this Complaint, given that Bowhead and other companies that specialize in developmental products would be ineligible for TSD consideration.

26.     ASTi has a direct economic interest in the DRMS-NG award. ASTi has received dozens of similar DoD awards from previous bids, including multiple awards from the Navy and

from divisions within NAVAIR. ASTi possesses unparalleled, proprietary capabilities in the market for training and simulation communications technologies, which it has developed over the course of more than thirty years in business with military, government, and commercial customers. ASTi products meet or exceed the DRMS-NG requirements, and ASTi has attempted to discuss its products with TSD.

27.     ASTi is a prospective offeror because it timely filed this post-award bid protest and diligently pursued its rights with the agency. It had no opportunity to protest or bid in response to the original solicitation because it was not published and because TSD issued the award without even giving ASTi or any other company a chance to bid or protest. ASTi would have submitted a bid if it were given the opportunity that the law requires, and it intends to do so if TSD considers commercial technology as the law requires and/or if it opened the section 8(a) process to competition.

28.     This Court has jurisdiction over this bid protest and challenge to the DRMS-NG award pursuant to 28 U.S.C. § 1491(b)(1) because TSD issued an award, the award was made in connection with a procurement for the DRMS-NG system, and ASTi would have a substantial chance of receiving the award if the laws were enforced. ASTi has standing to challenge the award because it has a direct economic interest in the award and it is a prospective offeror.

**BACKGROUND**

I.    **Government Agencies Must Prioritize The Procurement Of Commercial And Nondevelopmental Products, And They Must Avoid Unlawful Discrimination On The Basis Of Race Or Tribal Status.**

    A.    **Federal Law Requires Agencies To Prioritize The Procurement Of Commercial And Nondevelopmental Products.**

        1.    **10 U.S.C. § 3453 requires agencies to procure commercial and nondevelopmental products "to the maximum extent practicable," and to conduct related market research.**

29.    In 1994, Congress enacted the Federal Acquisition Streamlining Act ("FASA"). Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103-355, § 8104, 108 Stat. 3243 (1994) (current version at 10 U.S.C. § 3453). FASA requires agencies "to the maximum extent practicable" to procure commercial and nondevelopmental items to meet agency requirements.

30.    To implement this clear and mandatory preference, Congress imposed a series of requirements that apply both to civilian, non-defense contracts, 41 U.S.C. § 3307, and to contracts entered into by agencies within the DoD relating to national security, defense, or intelligence, 10 U.S.C. § 3453.

31.    Section 3453(a) ensures that agencies do not add artificial or unnecessary requirements that exclude commercial items from competing. It states:

> *The head of an agency shall ensure that, to the maximum extent practicable—*

(1) requirements of the agency with respect to a procurement of supplies or services are stated in terms of—

    (A) functions to be performed;

    (B) performance required; or

    (C) essential physical characteristics;

(2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

(3) offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.

*Id.* (emphasis added).

32.    Section 3453(b) requires the "head of an agency" to ensure that procurement officials in that agency, "*to the maximum extent practicable*," "acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency." *Id.* §§ 3453(b)(1)–(2) (emphasis added).

33.    Section 3453 also contains requirements designed to prevent agencies from remaining ignorant of available commercial or nondevelopmental items. Agencies must "conduct market research appropriate to the circumstances" before developing new specifications, soliciting bids or proposals, and awarding a task order or delivery order, and "shall use the results of market research" to determine whether commercial or nondevelopmental items are available that:

(A) meet the agency's requirements;

(B) could be modified to meet the agency's requirements; or

(C) could meet the agency's requirements if those requirements were modified to a reasonable extent.

*Id.* § 3453(c)(2).

34.    Regulations implementing § 3453 provide that agencies should use market research to "determine the extent to which commercial products, or nondevelopmental items could be incorporated at the component level," and to "determine the practices of firms engaged in producing, distributing, and supporting commercial products or commercial services, such as type of contract, terms of warranties, buyer financing, maintenance and packaging, and marking." 48 C.F.R. §§ 10.001(a)(3)(iii)–(iv).

35.    Congress enacted FASA to address the waste and inefficiencies stemming from a history of long-term developmental contracts that did not sufficiently take advantage of existing commercial technology. Such contracts led to cost overruns, wasted resources, unnecessary delay, and use of inferior and outdated technology, particularly in the defense industry. As a result, in its report for the legislation, the Senate Armed Services Committee stressed that it was "critical" that the Defense of Department "rely to the maximum extent possible on the commercial sector rather than promote government-dependent sectors," and that its "outmoded system" needed to be transformed to enable "the government to buy goods and services cheaper and faster" and "meet the defense industrial and technology base requirements of the future." S. Rep. 103-259, 1994 WL 184554, at *6 (May 12, 1994).

36.    Then-Defense Secretary William Perry similarly testified in connection with Congress' FASA deliberations that:

> Commercial technology advancements are outpacing DoD sponsored efforts in the same sectors that are key underlying technologies for military superiority (e.g., computers, software, integrated circuits, communications, and advanced materials). The current development and production of DoD systems takes too long. The design cycle for commercial technologies is approximately 3-4 years, in DoD it is 8-10 years. Many DoD systems are technologically obsolete at the time they are fielded.

Secretary William Perry's Testimony to Congress, S. Rep. 103-259, 1994 WL184554, *5.

37.    The Senate Committee on Government Affairs similarly stated that the "purchase of proven products such as commercial and nondevelopmental items can eliminate the need for research and development, minimize acquisition lead time, and reduce the need for detailed design specifications or expensive product testing." S. Rep. 103-258, 1994 WL 188485, at *6 (May 11, 1994). It also noted that the current system "frequently sets standards for its purchases that make them more costly, but not substantially more useful, than other products available through normal commercial channels." *Id.* at *9.

12

38.     The House Committee on Government Operations amplified the same concerns, stating:

> The Federal procurement system is still plagued with the all-too-common practice of buying expensive, specially-designed products, when off-the-shelf, commercial products would do the job just as well. In this era of fiscal restraint, the Federal Government must stop 're-inventing the wheel' and learn to depend on the wide array of products and services sold to the general public on a routine basis. Over the years, numerous commissions and studies have recommended that the Government revise its policies to improve its ability to buy commercial products.

H. Rep. 103-545(I), 1994 WL 261997 (June 13, 1994).

### 2.     More recent statutes, regulations, and reports further underscore the importance of acquiring nondevelopmental products in the areas of software and related technology.

39.     Congress has reinforced § 3453's requirements in the specific areas of computer software and related technology, and various government reports have warned that failure to adopt the most advanced commercial software in these areas will greatly compromise the country's technological capabilities.

40.     Congress has reiterated the importance of acquiring commercial or nondevelopmental items in enacting the annual National Defense Authorization Act ("NDAA"). For example, § 803 of the NDAA for Fiscal Year ("FY") 2009 provides:

> (a) In General.--The Secretary of Defense shall ensure that contracting officials identify and evaluate, at all stages of the acquisition process (including concept refinement, concept decision, and technology development), opportunities for the use of commercial computer software and other non-developmental software.

NDAA FY09, P.L. 110-417, § 803(a), 122 Stat. 4519.

41.     Likewise, regulations have implemented the preference for acquiring commercial and nondevelopmental items, especially in the area of computer software. The Defense Federal Acquisition Regulation Supplement ("DFARS") now requires departments and agencies, "at all stages of the acquisition process (including concept refinement, concept decision, and technology

13

development),” to identify and evaluate “opportunities for the use of commercial computer software and other non-developmental software in accordance with Section 803 of the National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417).” 48 C.F.R. § 212.212.

> **3.    Section 8(a) sole-source provisions do not displace the commercial product preference requirement and TSD cannot rely on Section 8(a) to circumvent that requirement.**

42.    None of the 8(a) provisions in 15 U.S.C. § 637(a) override the commercial product preference rules in 10 U.S.C. § 3453 that require acquisition of commercial products and other preferences for commercial products “to the maximum extent practicable.” *See, e.g.*, *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 546 (2010) (“Using an 8(a) or any other type of small business set-aside would not relieve the Air Force of its obligation to perform the acquisition planning and market research required by the FAR.”).

43.    The commercial product preference requirement that applies to the military, 10 U.S.C. § 3453, and its non-military analog, 41 U.S.C. § 3307, express an unequivocal congressional preference for commercial and nondevelopmental products with no exception for small business development efforts. That preference would be fatally undermined if subjected to an exception whenever there is an 8(a) participant available to develop products to satisfy government requirements.

> **B.    The Fifth Amendment Equal Protection Guarantee Prohibits Discrimination On The Basis Of Race Or Tribal Status In A Way That Is Untethered From Issues Of Tribal Sovereignty Or Remedying The Effects Of Past Discrimination, Including In Connection With SBA 8(a) Preferences For Native American Tribes And ANC Subsidiaries.**

44.    The SBA Section 8(a) business development program allows the government to issue procurement awards to “small business concerns” that are owned and controlled by socially and economically disadvantaged individuals. 15 U.S.C. § 637(a)(1). In most cases, those awards must be made after a competition between two or more bidders. *Id.* § 637(a)(1)(D).

45.     "Small business concerns" includes those businesses that are (1) organized for profit; (2) operating primarily within the United States; (3) independently owned and operated; (4) not dominant in their field on a national basis; and (5) in compliance with the applicable SBA size limit, which for "Other Communications Equipment Manufacturing" is 750 employees, for "Software Publishers" is $47 million in average annual receipts, and for "Military and Aerospace Equipment and Military Weapons" is $47 million in average annual receipts. 15 U.S.C. § 632; 13 C.F.R. § 121.201

46.     "Socially disadvantaged individuals" includes "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. 637(a)(5). The general rule, which does not apply to Bowhead or to other Indian tribe or ANC subsidiaries, is that SBA conducts individualized determinations of eligibility, and "[a]ll determinations . . . with respect to whether a group has been subjected to prejudice or bias shall be made by the Administrator after consultation with the Associate Administrator for Minority Small Business and Capital Ownership Development." *Id.* § 637(a)(8).

47.     "Economically disadvantaged individuals" includes "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). The general rule, which does not apply to Bowhead or to other ANC subsidiaries, is that 8(a) program participants must share evidence with the SBA each year to prove that they remain covered by the statutory definition. The SBA is obligated to conduct a review of a participant if it has any reason to believe that the participant is no longer eligible. *See, e.g.*, *id.* §§ 637(a)(6)(B)–(C).

48.    The Small Business Act, which governs the 8(a) program, provides that any contract opportunity offered for award pursuant to the 8(a) program shall be awarded on the basis of competition restricted to eligible program participants if (1) there is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price, and (2) the anticipated award price of the contract (including options) will exceed $7,000,000 in the case of a contract opportunity assigned a standard industrial classification code for manufacturing and $3,000,000 (including options) in the case of all other contract opportunities. 15 U.S.C. § 637(a)(1)(D). The actual minimum dollar threshold differs from the statutory threshold—it is governed by federal regulation and regularly adjusted to account for inflation.

49.    The D.C. Circuit has upheld the constitutionality of these general rules that govern most participants in the 8(a) program. Individualized assessments of social and economic disadvantage, which look for actual effects of prejudice, were central to its holding: "Section 8(a) uses facially race-neutral terms of eligibility to identify individual victims of discrimination, prejudice, or bias, without presuming that members of certain racial, ethnic, or cultural groups qualify as such. That makes it different from other statutes that either expressly limit participation in contracting programs to racial or ethnic minorities or specifically direct third parties to presume that members of certain racial or ethnic groups, or minorities generally, are eligible. Congress intentionally took a different tack with section 8(a), opting for inclusive terms of eligibility that focus on an individual's experience of bias and aim to promote equal opportunity for entrepreneurs of all racial backgrounds." *Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 62 (D.C. Cir. 2016).

50.    This case against TSD is different because of two exceptions to the general rules

that govern the 8(a) program: (i) competition is not required for awards that are issued to 8(a) participants owned and controlled by Native American tribes or ANCs and (ii) no individualized assessment of social or economic disadvantage is necessary for participation in the 8(a) program for businesses owned and controlled by an ANC. Bowhead benefited from both of those exceptions in this case.

51.     Competition is not required for awards that are issued to 8(a) participants owned and controlled by Native American tribes or ANCs. Federal regulations implementing the 8(a) program provide that an acquisition offered to the SBA under the 8(a) program must be awarded on the basis of competition limited to eligible 8(a) participants unless (1) "there is not a reasonable expectation that at least two eligible and responsible 8(a) participants will submit offers at a fair market price"; or (2) "SBA accepts the requirement on behalf of a concern owned by an Indian tribe or an Alaska Native Corporation." 48 C.F.R. § 19.805-1(b). Those regulations do not conflict with the statutory 8(a) competition requirements, which do not mention exceptions for Indian tribes or ANCs, because Congress, in enacting the Business Opportunity Development Reform Act of 1988, added a statutory note to the Small Business Act stating that the 8(a) competition requirement "shall not apply to Program Participants that are owned and controlled by economically disadvantaged Indian tribes[.]"

52.     No individualized assessment of social or economic disadvantage is necessary for ANC-owned and -controlled businesses to participate in the 8(a) program. The Small Business Act provides that small business concerns are eligible for participation in the 8(a) program if owned and controlled by "an economically disadvantaged Indian tribe (or a wholly owned business entity of such tribe)." 15 U.S.C. § 637(a)(4)(A)(i)(II). That provision literally scraps consideration of social disadvantage for entities that are owned and controlled by Indian tribes. *Compare with id.* §

637(a)(4)(A)(i)(I) (providing that small business concerns are eligible for participation in the 8(a) program if owned and controlled by "one or more *socially and economically* disadvantaged individuals") (emphasis added). Another provision of federal law scraps consideration of *economic* disadvantage for entities that are owned and controlled by ANCs. It provides that "[f]or all purposes of Federal law, a Native Corporation shall be considered to be a . . . minority and economically disadvantaged business enterprise if the Settlement Common Stock of the corporation and other stock of the corporation held by holders of Settlement Common Stock and by Natives and descendants of Natives, represents a majority of both the total equity of the corporation and the total voting power of the corporation for the purposes of electing directors." 43 U.S.C. § 1626(e)(1). An adjacent provision of that same section explains that direct and indirect subsidiary corporations, joint ventures, and partnerships of such Native Corporations should be treated the same way. 43 U.S.C. § 1626(e)(2).[2] ANC entities are therefore unique among minority-owned and -controlled entities in that they are deemed by law to be socially and economically

---

[2] The Congressional Research Service published a helpful document that thoroughly details the relevant 8(a) rules, including those that are specific to ANC participants. *See* CONG. RSCH. SERV., R44844, SBA'S "8(A) PROGRAM": OVERVIEW, HISTORY, AND CURRENT ISSUES 15, 18–23, 43–47 (2022), https://crsreports.congress.gov/product/pdf/R/R44844.

disadvantaged regardless of whether it is true.[3]

53.    The D.C. Circuit's decision in *Rothe Development* thus cannot justify (i) the categorical and indiscriminating carveout from competition for Indian tribes and ANCs that TSD relied on in this case or (ii) the additional presumption of social and economic disadvantage that is afforded to ANC entities seeking to participate in the 8(a) program. That decision unambiguously relied on individualized assessments of actual prejudice to uphold the eligibility of "socially and economically disadvantaged" small business concerns. The only way that the ANC preferences implicated by this case can survive constitutional scrutiny is if they are justified by equal protection jurisprudence specific to preferences and burdens for Indian tribes.

54.    In *Morton v. Mancari*, 417 U.S. 535, 535–55 (1974), the Supreme Court addressed the propriety of a congressionally legislated employment preference for qualified Indians at the Bureau of Indian Affairs ("BIA"). The Court found that the preference was consistent with the Fifth Amendment equal protection guarantee because of the unique relationship between Congress and the Indian tribes. The Court emphasized, however, that "the legal status of the BIA is truly *sui*

---

[3] ANC subsidiaries reap unique, indirect benefits from these express preferences. The 8(a) program is only available to "small business concerns," and so subsidiaries that wish to participate must comply with size requirements, which are expressed in terms of average annual receipts or number of employees. 13 C.F.R. § 124.109. SBA determines size requirement compliance, and in doing so, it ignores parent company data, unless ignoring parent company data threatens to lend the subsidiary a "substantial unfair competitive advantage within an industry category." *Id.* § 124.109(c)(2)(iii). It generally will make little difference whether parent company data is considered, because the subsidiary seeking to participate in the 8(a) program must prove social and economic disadvantage, and it is unlikely that the subsidiary of a large parent company could do so. But that is not the case for ANC subsidiaries, which need not prove social or economic disadvantage at all. And so it is critical that parent company data be considered if an ANC subsidiary is otherwise likely to receive an unfair competitive advantage. The Government Accountability Office ("GAO") published a report suggesting that SBA struggles to properly consider parent company data for ANC subsidiaries. *See* U.S. Gov't Accountability. Off., GAO-06-399, Contract Management: Increased Use of Alaska Native Corporations' Special 8(a) Provisions Calls for Tailored Oversight (2006), https://www.gao.gov/products/gao-06-399. GAO recommended in 2012 that SBA develop and implement a policy to determine whether ANC subsidiaries receive an unfair advantage. *Id.* It is unclear whether SBA did so, but the outcome in this case suggests that it did not.

19

*generis*," and that the case might have turned out different had the Indian preference not been "reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its constituent groups." *Id.* at 554.

55.     Justice Kavanaugh has emphasized in recent separate opinions that the government is limited in its ability to discriminate on the basis of race or tribal status. *See West Flagler Assocs., Ltd. v. Haaland*, 144 S. Ct. 10 (2023) (Kavanaugh, J.) (noting that a state law "raises serious equal protection issues" by limiting certain off-reservation casino gambling to Tribal casinos); *Haaland v. Brackeen*, 143 S. Ct. 1609, 1661 (2023) (Kavanaugh, J., concurring) ("In my view, the equal protection issue is serious.").

56.     Precedent makes clear that the only permissible Indian preferences are those that are tied to Indian lands, to uniquely sovereign interests, or to the special relationship between the federal government and the Indian tribes. *See United States v. Antelope*, 430 U.S. 641, 646 (1977) (federal regulation of criminal conduct within Indian country); *Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 481 (1976) (tax "on personal property located within the reservation," fee "applied to a reservation Indian conducting a cigarette business for the Tribe on reservation land," and tax on "on-reservation sales by Indians to Indians"); *Fisher v. District Court*, 424 U.S. 382, 389 (1976) (on-reservation adoption proceedings); *United States v. Garrett*, 122 Fed. App'x 628, 631 (4th Cir. 2005) (gaming on tribal lands). None of those factors are implicated when the federal government singles out an ANC entity for special treatment in a nationwide business development program, or in a Navy contract procurement for critical military training technology.

20

II.     **ASTi Offers Commercial, Nondevelopmental Products That Meet And Exceed The DRMS-NG Requirements, And TSD Failed To Consider Those Products Before Issuing An Award To Bowhead.**

   A.     **ASTi Offers Commercial, Nondevelopmental Training and Simulation Products.**

57.     ASTi has three decades of experience designing, developing, and dealing distributed communications and simulated radio environments. Its Voisus line (which includes both software and hardware products) provides customers with a multi-source communications management system designed to work with training and simulation systems (including LVC systems, and including those systems operated by the military).

58.     Voisus products are accessible from the battlefield, on the premises of military facilities, and through cloud systems that are secure from cyberattack. Voisus comes ready to use and is considered a short lead time nondevelopmental product, though where required or preferred, it can be customized by the military, contractors, or ASTi itself via public and open Application Programming Interfaces ("API"), which are relatively easy to work with, and which do not alter the nondevelopmental nature of the product.

59.     Voisus products are currently deployed at numerous Navy facilities such as those operated by the Naval Surface Warfare Command ("NSWC") and Naval Sea Systems Command ("NAVSEA"). Voisus has field-proven interoperability with DoD programs like DRMS, Joint Simulation Bus, Naval Aviation Simulator Master Plan, and Navy Continuous Training Environment.

60.     ASTi amortizes research and development, production, and sustainment costs across a wide customer base to minimize prices borne by any individual customer. Working with ASTi allows the government to realize cost savings and rapid acquisition of technology advancements derived from the competitive commercial marketplace. ASTi sustainment services

further reduce lifecycle costs and risks, as compared to the internal-development model associated with DRMS, where customers must assume sole ownership of lifecycle support.

61.     ASTi Voisus products are available off the shelf for delivery within as little as sixty days of an order being placed for hardware, and within as little as a week of an order being placed for software. Voisus capabilities can be deployed as individual subsystems to solve specific problems, or as ready to use, turnkey systems. Every quarter, and sometimes more frequently based on demand signals, ASTi will update its software and hardware to maximize technical capabilities and data security.

**B.     ASTi Products Meet And Exceed The DRMS-NG Requirements.**

62.     ASTi has collected what appear to be DRMS-NG requirements through extensive discussions with user groups across the United States Armed Forces. This information might be incomplete, since the Navy has declined to release any information about DRMS-NG, and ASTi might be forced to amend its complaint should it discover currently unknown requirements. ASTi products can satisfy all DRMS-NG requirements that it currently knows to exist.

63.     DoD requires that its information systems comply with certain Information Assurance ("IA") requirements, which are enforced through the Risk Management Framework ("RMF"). Those requirements are aimed at reducing risk to data stored in DoD information systems. The ASTi Voisus line complies with all IA and RMF requirements.

64.     DRMS-NG requires software-based communications clients that can be hosted on computers, mobile devices, and integrated with simulators and games. The clients must provide operators with access to virtual and live radios, calling-conferencing, intercoms, and chat capabilities. RF radios at different security levels must be controllable and accessible from a single communications client console. The ASTi Voisus line includes a Voice Communication Clients product that satisfies those requirements.

65.     DRMS-NG must connect tactical radios on austere ranges to IP networks for distributed access by remote uses. It must allow monitoring and recording of voice communications. It must extend the range of tactical radios beyond the line of sight and radio cross-banding. And it must be compatible with the latest generation of Ethernet-ready radios. The ASTi Voisus line includes a Radio Over IP Bridge ("RoIP") capability that satisfies those requirements.

66.     DRMS-NG requires live tactical radio monitoring and remote control. It must be able to control downrange tactical radios from any network point, using a conventional web browser or an operator-based Voice Communication Client system. The ASTi Voisus line includes a Radio Control capability that satisfies those requirements.

67.     DRMS-NG must integrate telephones with radios, software clients, and simulators. It must be compatible with Voice Over IP ("VoIP"), PBX, public telephone systems, tactical intercom, and conferencing systems. The ASTi Voisus line includes a Telephony product that satisfies those requirements.

68.     DRMS-NG must provide communications logging for after action reviews ("AAR") and "blackbox" incident investigations. It must include features like record and playback, and archival storage, with voice transcription features. The ASTi Voisus line includes a Simscribe product and a Comms Logger product that satisfy those requirements.

69.     ASTi offers fully developed, commercial products that can meet the needs that TSD appears poised to have Bowhead meet through a developmental contract. ASTi's product line is fully developed, military field proven, DoD accredited, and lifecycle sustained.

**C.     TSD Failed To Consider ASTi Products Before Issuing An Award To Bowhead.**

70.     TSD determined that it needed to develop a new version of DRMS because the

prevailing version suffered from inadequacies that themselves resulted from TSD's past insistence on relying on development in lieu of taking advantage of existing commercial technologies. Industry professionals first got wind of TSD's intent to pursue the next generation of DRMS in June of 2023 at the Training and Simulation Industry Symposium, when TSD announced a general intent to pursue an Indefinite Delivery/Indefinite Quantity procurement seeking to acquire the capability to develop, design, produce, modify, test, deliver and support DRMS. ASTi attempted to discuss the DRMS-NG procurement with the TSD Director of Cross-Warfare Programs, but she was unavailable to meet, and so ASTi spoke instead with the commanding officer of TSD. Minimal updates were provided in connection with the July and September PALT meetings (*i.e.*, updates to the anticipated timeline), but TSD indicated only that an 8(a) acquisition was "anticipated." No solicitation was ever made public, and the particular acquisition strategy was not "confirmed" until after TSD issued an award.

71.    ASTi combed the public records regularly but was unable to find any evidence of a solicitation until November 14, 2023, when ASTi learned through an update (provided in connection with the November PALT meeting) that TSD had already issued an award to Bowhead to develop the DRMS-NG system in cooperation with TSD technical staff. The spreadsheet provided by TSD in connection with PALT states that the "Acq Strategy" was "8(a)," that the "Actual RFP" was dated "17 JUL 2023," and that the "Actual Award" of $12.3 million was made "28 SEP 2023" to "Bowhead." There was no public indication of the award until the November PALT Program List was released. TSD gave no indication at the July PALT meeting that it would be releasing an RFP just six days later, and it gave no indication at the September PALT meeting that an RFP had been issued two months earlier.

72.    In response, ASTi submitted a FOIA request on December 8, 2023, and sent a letter

to TSD, seeking (1) any RFP or solicitation that was issued for DRMS-NG (whether public or otherwise); (2) the documentation of the DRMS-NG award to Bowhead; (3) the relevant contract or contractual documents governing the DRMS-NG award to Bowhead; and (4) the detailed performance specifications that the development was intended to specify. ASTi requested a response from TSD by December 19, 2023.

73.    The contracting officer for DRMS-NG responded with a letter to ASTi on December 19, 2023. Without providing a copy of the solicitation or award as requested, the officer stated that the DRMS-NG award was made to Bowhead Professional and Technical Solutions, LLC, an 8(a)-program participant, as a "follow-on to a previously awarded 8(a) effort." This clarification, however, raised more questions than it answered given that TSD initially had described the DRMS-NG procurement in June 2023 as a clean sheet $15 million sole-source award for "ADDON SERVICES, LLC." TSD never signaled its intent to award a follow-on contract to Bowhead for the DRMS-NG procurement. It remains unclear which contract the DRMS-NG award is meant to follow or whether Bowhead was involved in a prior procurement effort.

74.    TSD chose Bowhead so that it could develop the DRMS-NG system internally, in complete secrecy, and without defending its decision to ignore existing commercial offerings. Bowhead does not appear to offer any existing commercial technology that meets the DRMS-NG requirements, and in fact, it does not appear to offer any commercial product at all.

75.    TSD failed to properly research whether commercial products existed that might satisfy the requirements and specifications of the DRMS-NG procurement. If it did then it would have realized that viable options were available. TSD further failed to publish the solicitation, and so interested bidders were unable to bid. ASTi only learned about the award to Bowhead by happenstance when TSD shared a spreadsheet in connection with a PALT meeting. TSD

effectively acknowledged each of these issues in its December 19 response. It noted in its response

that it was "unaware" of existing commercial items that would meet its requirements, but its

response said nothing of what research it did to identify such items, and its response failed to

identify any requirements that ASTi products could not meet. As of the filing of this complaint,

TSD still has not produced copies of the solicitation and award.

### III.    TSD's DRMS-NG Solicitation And Award To Bowhead Violated Its Legal Obligations.

#### A.    TSD Violated 10 U.S.C. § 3453 And Related Laws By Failing To Conduct Required Market Research, And By Failing To Procure Commercial And Nondevelopmental Items To Meet The DRMS-NG Requirements.

76.    Federal statute requires that government agencies conduct market research to

determine whether commercial products are available to satisfy a procurement, and if they are,

then agencies must prioritize the procurement of commercial products "to the maximum extent

practicable." 10 U.S.C. § 3453.

77.    Federal regulations enacting that statute provide that requisite market research

might be completed by "publishing formal requests for information in appropriate technical or

scientific journals or business publications," querying . . . Government and commercial databases

that provide information relevant to agency acquisitions," "participating in interactive, on-line

communication among industry, acquisition personnel, and customers," or "conducting

interchange meetings or holding presolicitation conferences to involve potential offers early in the

acquisition process." 48 C.F.R. § 10.002(b)(2). TSD did none of those things before issuing either

its solicitation or award to Bowhead. TSD engaged in no market research, and it ignored currently

available commercial offerings, because it was never interested in commercial products in the first

place. This open defiance of laws that favor commercial products is unlawful and arbitrary and

capricious.

**B.  TSD Violated the Fifth Amendment Equal Protection Guarantee By Awarding Bowhead A Contract On the Basis Of Its Race Or Tribal Status.**

78.  In addition to its violations of section 3453 and associated regulations, TSD unconstitutionally issued a sole-source award to Bowhead under section 8(a) pursuant to provisions that confer exceptions to competition for Bowhead and other entities that are owned and controlled by Indian tribes, and pursuant to statutory provisions that deem Bowhead and other ANC subsidiaries socially and economically disadvantaged.

79.  TSD openly acknowledges that it issued a sole-source 8(a) award to Bowhead. It did so to conceal from public eyes its decision to develop internally what it should be procuring commercially. Federal statutes governing the 8(a) program provide that any contract opportunity offered for award pursuant to the 8(a) program shall be awarded on the basis of competition restricted to eligible program participants if there are two or more competitors available and a minimum dollar threshold is satisfied. 15 U.S.C. § 637(a)(1)(D). Both requirements were met in this case: there were two or more potential competitors (inasmuch as ASTi had the ability to partner with an eligible section 8(a) company), and the minimum dollar threshold was satisfied. TSD chose to take advantage of a regulatory loophole which excuses competition where an award is issued to an ANC. *See* 48 C.F.R. § 19.805-1(b)(2). Bowhead was only able to access the 8(a) program and enter into an 8(a) contract with TSD because federal law deems the company socially and economically disadvantaged despite the fact that Bowhead is a subsidiary of one of the largest employers and revenue generators in the State of Alaska. The legal preferences that Bowhead benefitted from are completely untethered from issues of tribal sovereignty or remedying the prejudicial effects of past discrimination. There is no constitutional justification for these preferences to Bowhead, and issuing an award to Bowhead in this manner violated the Fifth Amendment equal protection guarantee.

27

## CLAIMS FOR RELIEF

### COUNT ONE

**TSD Violated 10 U.S.C. § 3453 And Related Regulations By Failing To Conduct Sufficient Market Research To Determine Whether Commercial Products Existed That Might Satisfy The DRMS-NG Requirements.**

80.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

81.    Under 28 U.S.C. § 1491(b)(4), this Court must set aside as unlawful any solicitation that violates the standards set forth in 5 U.S.C. § 706. Section 706 provides that an agency action must be set aside if it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

82.    10 U.S.C. § 3453 contains requirements designed to prevent agencies from remaining ignorant of available commercial or nondevelopmental items. Agencies must "conduct market research appropriate to the circumstances" before developing new specifications, soliciting bids or proposals, and awarding a task order or delivery order, and "shall use the results of market research" to determine whether commercial or nondevelopmental items are available that (1) meet the agency's requirements; (2) could be modified to meet the agency's requirements; or (3) could meet the agency's requirements if those requirements were modified to a reasonable extent. 10 U.S.C. § 3453(c)(2).

83.    Regulations implementing § 3453 provide that agencies should use market research to "determine the extent to which commercial products, or nondevelopmental items could be incorporated at the component level," and to "determine the practices of firms engaged in producing, distributing, and supporting commercial products or commercial services, such as type of contract, terms of warranties, buyer financing, maintenance and packaging, and marking." 48 C.F.R. §§ 10.001(a)(3)(iii)–(iv).

84.     TSD failed to conduct any of the requisite market research (and to make any of the requisite determinations) before issuing its solicitation and before issuing an award to Bowhead, and it conceded as much by acknowledging that it was "unaware" of any commercial products that would satisfy the DRMS-NG requirements. This artful phrasing ignored that TSD had an affirmative obligation to conduct market research. This is particularly true when TSD had used ASTi products before and even a modicum of additional research would have shown that ASTi commercial products would satisfy the DRMS-NG requirements. This failure by TSD to conduct requisite market research violates at least the following statute and regulations: 10 U.S.C. § 3453; 48 C.F.R. § 10.001; and 48 C.F.R. § 10.002.

85.     Accordingly, and for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, the award to Bowhead should be set aside as an award that was based on legally inadequate market research and therefore "not in accordance with law."

## COUNT TWO

**TSD Violated 10 U.S.C. § 3453 And Related Regulations By Refusing To Procure Commercial Or Nondevelopmental Items To The Maximum Extent Practicable.**

86.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

87.     Under 28 U.S.C. § 1491(b)(4), this Court must set aside as unlawful any solicitation that violates the standards set forth in 5 U.S.C. § 706. Section 706 provides that an agency action must be set aside if it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

88.     Section 3453 and related regulations require that TSD ensure "to the maximum extent practicable," the acquisition of commercial services, commercial products, or

nondevelopmental items other than commercial products to meet the needs of the agency. 10 U.S.C. § 3453(b)(1).

89.    Moreover, the DFARS requires that "Departments and agencies *shall* identify and evaluate, at all stages of the acquisition process (including concept refinement, concept decision and technology development), opportunities for the use of commercial computer software and other nondevelopmental software in accordance with § 803 of the National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417)." 48 C.F.R. § 212.212 (emphasis added).

90.    ASTi has a commercial or nondevelopmental product line that meets and exceeds the DRMS-NG requirements. ASTi has specifically requested on several occasions that TSD staff discuss the possibility that ASTi might be able to satisfy the DRMS-NG system requirements, but TSD has refused to do so in favor of launching a developmental effort to develop much—if not all—of the same capabilities. TSD therefore has failed to meet its obligation to ensure, to the maximum extent practicable, that it incorporates commercial or nondevelopmental items to meet the DRMS-NG requirements as set forth in § 3453 and related regulations.

91.    This failure by TSD violates at least the following statute and regulations: 10 U.S.C. § 3453; 48 C.F.R. § 11.002; and 48 C.F.R. § 212.212. TSD's failure to comply with these provisions is irreparably harming ASTi and the public interest by preventing acquisition and integration of its Voisus platform into the DRMS-NG procurement in lieu of a wasteful development-oriented solution. If TSD complies with its legal obligations and conducts a full and fair evaluation of Voisus capabilities, it will conclude—or at a minimum is substantially likely to conclude—that Voisus can meet the needs for DRMS-NG.

92.    Accordingly, and for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, the DRMS-NG award should be set aside as an award

that is in conflict with the commercial product preference requirements and therefore "not in accordance with law."

## COUNT THREE

**TSD Awarded the Contract Without Competition Pursuant To Unconstitutional Preferences That Discriminate On The Basis Of Race In A Manner That Is Untethered From Issues Of Tribal Sovereignty Or Remedying The Effects Of Past Discrimination.**

93.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

94.    TSD used the 8(a) program to issue an award to Bowhead for the DRMG-NG procurement. Federal statute provides that any contract opportunity offered for award pursuant to the 8(a) program shall be awarded on the basis of competition restricted to eligible program participants if (1) there is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price, and (2) the anticipated award price of the contract (including options) will exceed $7,000,000 in the case of a contract opportunity assigned a standard industrial classification code for manufacturing and $3,000,000 (including options) in the case of all other contract opportunities. 15 U.S.C. § 637(a)(1)(D).

95.    Federal    regulations    implementing    the    8(a)    program    provide    that an acquisition offered to the SBA under the 8(a) program for a dollar amount above the minimum threshold must be awarded on the basis of competition limited to eligible 8(a) participants unless (1) "there is not a reasonable expectation that at least two eligible and responsible 8(a) participants will submit offers at a fair market price"; or (2) "SBA accepts the requirement on behalf of a concern owned by an Indian tribe or an Alaska Native Corporation." 48 C.F.R. § 19.805-1(b). TSD must claim the latter exception to competition because there are at least two eligible and responsible 8(a) participants able to submit offers at a fair market price.

96.    This preference is unconstitutional both generally and as applied in this case

31

because it is based on race or tribal status in a manner that is untethered from issues of tribal sovereignty or remedying the effects of past discrimination. Indeed, the award to Bowhead depended on two different unconstitutional preferences acting in concert: (i) a statutory and regulatory exemption from competition for ANCs and (ii) provisions of federal statutory law that presume that all ANCs are "economically disadvantaged" and "socially disadvantaged" without any individualized determination and without which Bowhead would not have been eligible to compete given the tremendous access to capital of its parent corporation. But for these preferences, individually and together, ASTi could have and would have partnered with an 8(a) participant to fulfill the requirements and specifications of the DRMS-NG procurement. An entire section of the Federal Register is devoted to 8(a) joint ventures between an 8(a) participating company and non-8(a) participating company. *See* 13 C.F.R. § 123.513. By failing to conduct a competitive procurement, TSD deprived ASTi of the opportunity to compete for the section 8(a) award even apart from its separate violations of section 3453 and related regulations.

97.    Under 28 U.S.C. § 1491(b)(4), this Court must set aside as unlawful any solicitation that violates the standards set forth in 5 U.S.C. § 706. Section 706 provides that an agency action must be set aside if it is, among other things, "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A). The use of unconstitutional preferences to award the contract to an ANC without competition is an independent ground for setting aside the award.

98.    Accordingly, for all of the foregoing reasons and those set forth more thoroughly in the body of the Complaint, the DRMS-NG award should be set aside as an award that is in contravention of the Fifth Amendment equal protection guarantee and "contrary to constitutional right, power, privilege, or immunity."

## PRAYER FOR RELIEF

WHEREFORE, ASTi respectfully requests that the Court:

1.      Find that TSD violated 10 U.S.C. § 3453 and related regulations by failing to conduct required market research into the availability of commercial and nondevelopmental items to meet its requirements and to ensure that its contractor, to the maximum extent practicable, incorporated commercial or nondevelopmental items, such as ASTi's Voisus line of products, into the DRMS-NG procurement;

2.      Find that TSD violated the equal protection guarantees of the Constitution and acted "contrary to constitutional right, power, privilege, or immunity," by awarding the DRMS-NG procurement to Bowhead;

3.      Enjoin TSD from violating 10 U.S.C. § 3453, 15 U.S.C. § 637(a)(1)(D), related regulations, and the Equal Protection component of the Fifth Amendment's Due Process Clause, enjoin the award that TSD issued to Bowhead, and instruct TSD that in order to comply with the law it must (1) conduct sufficient market research to make the determinations required by section 3453 (including a full and fair evaluation of ASTI products for the DRMS-NG system); (2) use that market research to make the statutorily required determinations; and (3) procure commercial items to the maximum extent practicable;

4.      Award ASTi its reasonable attorneys' fees; and

5.      Enter such other relief as the Court considers just and proper.

Respectfully Submitted,


By: /s/ Hamish P.M. Hume

Hamish P.M. Hume (Counsel of Record)
Samuel C. Kaplan
Gina A. Rossman
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-2727 (t)
(202) 237-6131 (f)
hhume@bsfllp.com
skaplan@bsfllp.com
grossman@bsfllp.com

Dated: December 29, 2023                    *Counsel for Plaintiff Advanced Simulation Technology inc.*

34